## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW HAMPSHIRE

Albert Tito

    v.                                                    Civil No. 18-cv-025-SM

State of New Hampshire[1]


### AMENDED REPORT AND RECOMMENDATION

Plaintiff, Albert Tito, a New Hampshire Department of Corrections ("DOC") prisoner, filed this action complaining of violations of his federal constitutional rights which occurred when he was an inmate at the New Hampshire State Prison ("NHSP").  The court subjected his original pleadings (Doc. Nos. 1, 2) to preliminary review pursuant to LR 4.3(d)(1) and 28 U.S.C. § 1915A and directed service of the matter upon defendant (former) New Hampshire State Prison ("NHSP") Warden Michael Zenk, NHSP Sgt. Gary Lydick, NHSP Corrections Officer ("CO") Farradon Young, and the unnamed corrections officers identified as "John Does 1-4."  See Jan. 25, 2018 Order (Doc. No. 4).  The court then subjected Tito's next set of complaint addenda to

---

[1]The court construes the pleadings as intending to name the following defendants to Tito's claims: New Hampshire State Prison ("NHSP") Warden Michael Zenk; NHSP Sgt. Gary Lydick, NHSP Corrections Officer ("CO") Farradon Young, CO Geoffrey Boffitto, and CO Jason Caruso; Mental Health Provider Barry Zani; Director of Medical and Forensic Services Paula Mattis; Secure Housing Unit ("SHU") CO Salse, SHU CO T. Miller, and Close Custody Unit ("CCU") CO Bazile and Sgt. Parent, whose first names are unknown; and an unnamed NHSP dental health provider.  The Order issued this date severs claims asserted against Bazile, Mattis, Parent, Zani, and the unnamed dental health provider.

further preliminary review and, on March 21, 2018, issued a
Report and Recommendation (Doc. No. 41) ("March 21 R&R"), and a
supplemental Order (Doc. No. 40) ("March 21 Order") to serve the
new defendants identified by the court.  Both parties objected.
The district judge's May 23, 2018 Order (Doc. No. 77) concluded
that although plaintiff's objection (Doc. No. 48) was without
merit, defendants' objection (Doc. No. 47) made legitimate
points regarding the possible misjoinder of unrelated claims in
this case; and transferred Document No. 47, construed as a
motion to reconsider the March 21 R&R, to the magistrate judge
to reconsider the identification, service, and possible
severance of any claims misjoined in this case.  Plaintiff
thereafter filed a motion to reconsider (Doc. No. 81) the March
21 R&R, and also filed a number of documents that appear
intended to amend the allegations underlying his claims,
including Document No. 48, which this court treats as a
complaint addendum for purposes of preliminary review.  This
Amended Report and Recommendation ("Amended R&R") effectively
replaces the March 21 R&R; summarizes the allegations and
identifies the claims in plaintiff's original pleadings (Doc.
Nos. 1, 2) and complaint addenda[2]; and addresses issues raised in

---

[2]The court has liberally construed thirteen separate filings
in this case as comprising addenda to his initial pleadings.
See Doc. Nos. 6, 8, 10, 18, 27, 29, 37, 43, 48, 52, 56, 57, and
62.  Going forward, the court expects plaintiff to avoid
piecemeal filings as to any future amendments to the complaint
he may seek to file.  See Fed. R. Civ. P. 15; LR 15.1.

Doc. No. 47, in accordance with the May 23, 2018 Order (Doc. No.
77).

**Background**

I.   Conditions of Confinement and Retaliation

    A.   SHU PAR Status

While incarcerated at the NHSP in 2017/2018, Tito was first
housed in the Reception and Diagnostic Unit ("R&D") and was then
transferred to the Secure Housing Unit ("SHU") in "pending
administrative review" ("PAR") status.  For the duration of his
PAR placement in SHU, Tito asked officers every day for access
to a shower, to make a phone call, and to go outside for
recreation.  Tito asserts that those requests were denied, but
that Tito's cellmate, Alfred Nyoni made the same requests which
were granted as to Nyoni.  Tito alleges that SHU Corrections
Officers ("COs") Young, T. Miller, Salse, and others, told Tito
he was their least favorite SHU inmate and was on "the list."
Doc. No. 6-1, at 23.

    B.   CCU Recreation Schedule and Cell Assignments

Tito alleges that he was transferred from SHU to the Close
Custody Unit ("CCU").  Sgt. Parent altered the recreation
schedule after Tito's arrival, Tito asserts, to elicit a
confrontation between Tito and other inmates, knowing, Tito
asserts, that every inmate in CCU linked the change in the

schedule to Tito.  Further, Tito asserts, Tito was assigned to
cells with "paranoid schizophrenic" cellmates, including an
inmate with a history of violence against his cellmates; an
inmate who had threatened to kill "whole tiers and had gone
through countless cellmates," with whom Tito ended up having a
good relationship; and a third inmate, nicknamed the "Nashua
Slicer," who wanted to be celled with Tito, but with whom Tito
did not agree to be celled.  Doc. No. 48, at ¶ 13.  Sgt. Parent
was responsible for those cell assignments and altered the
recreation schedule, Tito asserts, because Tito had filed one or
more Inmate Request Slips ("IRSs") complaining about harassment
and cover ups in the CCU, including an August 12 IRS forwarded
to the warden by Lt. Fontaine on August 14, 2017.  See Aug. 15,
2017 Warden Response to Aug. 12, 2017 IRS (Doc. No. 52, at 9).

### C.    SHU Suicide Watch & SHU Segregation

Tito further asserts that on August 21, 2017, while housed
in SHU, he was placed on suicide watch in a SHU dayroom for a
night and a day, after a mental health assessment indicated he
was at risk of self-harm.  See Doc. No. 6-1, at 29.  Tito
asserts that CO Salse issued him an oversized gown with no
Velcro, served him spaghetti and corn sauce with a squirt of
mustard in a paper bag tossed through the tray slot onto the
floor, gave him a foam mattress without a cover soaked with
cooking water, and left him overnight in a room that reeked of

urine.  Tito asserts that SHU officers refused Tito's requests,
and a request made by CO "Kirk" or "Kurk," to replace those
items.  Doc. No. 48, ¶ 5.

The next day, Tito was transferred to a SHU cell, where he
remained until September 20, 2017.  For sixteen days, Tito
alleges, he had only one shirt, one pair of pants, one pair of
boxers, two blankets, and a pillow case.  Tito asked officers
for clean clothes and a sheet, but those requests were denied.
See Doc. No. 6-1, at 30-31.  Tito asserts that every other SHU
inmate had clean clothes and bedding.  See Doc. No. 48, at 7.

Tito further alleges that, when he was in disciplinary
segregation in SHU for sixty-two days from October 2017 through
December 24, 2017, the conditions in which he was held did not
adequately protect him from winter weather, as the window in his
cell did not close properly (a fact known to Warden Zenk), and,
Tito further asserts, beginning on December 24, 2017 until
January 9, 2018, he was assigned to a cell on a tier without
heat, where ice formed on the inside of his window.  Tito
asserts he could not sleep due to the cold, and his requests for
extra blankets and clothes were denied.  He further asserts that
Capt. Boynton reported to the warden that the heat situation was
better, although in Tito's estimation, it had not improved.

II.  <u>CO Bazile</u>

　　　Tito alleges that when he was in the CCU prior to November 2017, CO Bazile targeted him for intimidation by trashing his cell during cell searches, throwing his chessboards in the toilet, stealing two of his pictures, and falsely accusing him of disciplinary offenses which caused him to be placed in the "tank" a number of times.  On one occasion, Tito asserts, Bazile handcuffed Tito during a cell search and then slammed Tito's head against a wall.  Tito called out to Sgt. Dupree but did not receive assistance.  The warden ordered an "after action review" of Bazile's use of force, which was undertaken by Capt. Boynton and Lt. Fontaine.  After that review was completed, Zenk found Tito's grievance about Bazile's use of force to be unsubstantiated.  <u>See</u> Doc. No. 52, at 1 (Tito, Nov. 23, 2017 IRS).


III.  <u>November 9, 2017 Incident and Aftermath</u>

　　　Plaintiff has claimed that on November 9, 2017, a week after Zenk responded to Tito's grievance about SHU conditions, SHU officers retaliated by assaulting Tito.  Specifically, he alleges that SHU COs Geoffrey Boffitto, Young, and Jason Caruso, and Sgts. Lydick and Totten, handcuffed Tito behind his back and removed him from his cell.  Lydick and Young then took Tito to a SHU dayroom to be strip-searched.  Other officers entered after them.  Plaintiff alleges that, while he was still handcuffed,

and compliant with orders, including Lydick's order that Tito be strip searched, officers pulled Tito's leg out from under him and took him to the floor. Tito alleges he went limp and did not resist. He alleges that while he was falling and lying on the ground, handcuffed, either CO Young or CO Boffitto punched him multiple times on the right side of his face, bouncing the left side of his head off the floor. Tito further alleges that Lydick tasered him in the lower back multiple times as well as in his face. Tito states that Boffitto put his knees on Tito's back and right arm, and Lydick shackled Tito.

After the incident ended, a nurse arrived to examine Tito. Tito was then strip-searched and left alone, unhandcuffed and partially clothed, in the dayroom. Plaintiff alleges that because of that incident, he had swelling, abrasions, and redness on his head, face, and neck, which caused his face to be unrecognizable. Tito also believes one of his testicles was injured during that incident, and that he may require surgery for that testicular injury.

On November 9, 2017, at the relevant time, Lt. Edmark was stationed in the SHU control room, in front of video monitors, including one streaming from a wall-mounted security camera showing the SHU dayroom where guards had brought Tito. The video recorded by that security camera begins before Tito was escorted into the SHU dayroom and ends after Tito was left alone after he was strip-searched. Tito has incorporated images from

7

that video by reference in his pleadings.[3]  Tito alleges that
having watched the security camera video, he has noted that CO
Young looks directly at the camera before taking him down, and,
Tito concludes, Young appears to have been waiting for Edmark's
"signal" indicating that Edmark had refocused the camera
"elsewhere in the room," Doc. No. 56, at 1-2, to "conceal the
attack," Doc. No. 43, at 1.  Tito further asserts that the
refocusing of the camera occurred "swiftly," as if Edmark had
done so "9,000 times" before, Doc. No. 56, at 1, and that the
refocusing appears "obvious[]" in the video, Doc. No. 48, at 5.

    Tito asserts that he feared for his physical safety while
at the NHSP after the November 9 assault, as officers told him
that his complaints brought them negative attention and
threatened their jobs, which they need to support their
families.  Tito further alleges that Sgt. Lydick and COs Caruso
and Salse began to serve him meal trays in early 2018, as an
attempt to intimidate him, because "the [November 9] assault by
staff issue started with my meal being tampered with."  Tito
further alleges that CO Salse made remarks about Tito's food,

---

[3]Document No. 26 is a DVD that contains two pertinent,
sealed, unredacted video files, one taken by a wall-mounted
security camera, and one taken by a hand-held video camera.
Document No. 89, also a DVD, contains a redacted copy of both
videos.  A third DVD in the record, Doc. No. 92, contains a copy
of the sealed, unredacted wall-mounted security camera video
file that is also saved on Doc. No. 26.

and Lydick gave him "threatening looks." Doc. No. 9, at 4. As a result, Tito began to refuse meals and lose weight.

Tito asserts that "biased" hearing officers found him guilty of disciplinary offenses arising out of the November 9 incident. He was sentenced to twenty-five days of punitive segregation (in addition to a fifty-five day punitive segregation sanction Tito was then serving).

Capt. Boynton and Maj. Fouts participated in an after-action review following the November 9 incident. Tito alleges that Boynton's characterization of the November 9 incident in a report, describing the videos, includes false information. Maj. Fouts signed off on Capt. Boynton's report.

IV. <u>Coos County Deputy Sheriff</u>

Tito has alleged that NHSP corrections officers involved in the November 9 incident, and others who have abused Tito, belong to the "Silver Eagles," which Tito describes as a gang comprised of corrections officers. Tito alleges that a Coos County Sheriff's Department Deputy, named "Charlie," is also Silver Eagle, and that Charlie has tried to intimidate Tito, his family, and friends in the past. Tito asserts that Charlie prevented Tito's brother from attending a jury voir dire and interfered with the jury pool in Tito's criminal case.

V.    <u>Legal Mail Issues and Legal Property</u>

Tito alleges that SHU officers interfered with his legal mail by: delaying delivery of plaintiff's incoming legal mail and opening, outside of Tito's presence, Tito's mail from the courts, the New Hampshire Justice Department, and Tito's attorney.  Tito further asserts that SHU officers have held up his outgoing legal mail, including mail addressed to the American Civil Liberties Union ("ACLU").  Tito also alleges that while he was in SHU in September 2017, his requests for access to his legal files in advance of a court proceeding were not promptly addressed.

VI.    <u>Mental Health Issues</u>

Upon Tito's arrival at the NHSP, NHSP mental health providers took plaintiff off the psychiatric medications he had been prescribed at the Coos County Department of Corrections. Tito asserts that his requests for mental health appointments and medication addressed to the NHSP nursing staff did not yield appointments for months, until he ended up on suicide watch on August 22, 2017.

Tito alleges that CCU Lt. Fontaine forwarded Tito's July 18, 2017 IRS about a lack of mental health appointments to Paula Mattis, after noting on the IRS that Tito had met several times with a mental health provider within the previous three weeks.

See Doc. No. 18-1, at 1.  Tito states that he had not had any mental health appointments during that period.

VII. <u>Dental Issues</u>

Tito alleges that upon his arrival at the NHSP, and prior to November 2017, he suffered from two rotten, painful, abscessed teeth and a missing filling, and that his requests for dental care were not promptly or properly addressed.  Tito alleges that he could not attend appointments that were scheduled for him due to conflicts with court dates, and that he declined one appointment because it was scheduled during an expected visit from his girlfriend.  Tito alleges that the dental care provider he saw after September 6, 2017 made him choose which problem to address.  See Doc. No. 6, at 4-5. Tito's other dental problems remained untreated for months.

VIII. <u>Failure to Protect</u>

Tito alleges that while he was housed in the CCU and SHU, he complained about abusive conditions, unmet mental health needs, and emergent dental problems to prison guards, supervisory personnel, his public defender, mental health providers, Coos County Sheriff's Department personnel, and NHSP health care providers.  See, e.g., Doc. No. 6.  Tito asserts that those people did not properly document or address his concerns.

Tito specifically asserts that his grievances to Warden Zenk, and to Christopher Kench and DOC Commissioner Helen Hanks, regarding his claims of harassment and retaliation, did not yield effective responses. Tito has alleged that Zenk was aware, both prior to and since the November 2017 assault, that Tito had been a target of retaliatory "violence" and harassment from COs for his complaints about prison staff.

### **Claims**

The claims asserted in Tito's complaint and complaint addenda (Doc. Nos. 1, 2, 6, 8, 10, 18, 27, 29, 37, 43, 48, 52, 56, 57, 62) are the following:

1.  NHSP Sgt. Gary Lydick, CO Farradon Young, CO Geoffrey Boffitto, and CO Jason Caruso violated Tito's Eighth Amendment rights on November 9, 2017, in that, while Tito was complying with the officers' orders and handcuffed with his hands behind his back, outside the presence of other inmates:

    a.  Lydick, Young, Boffitto, and Caruso forced Tito down to the floor, causing injuries;

    b.  Young, Boffitto, and/or the other officers punched Tito in the face, causing pain, swelling, bruising, and lacerations on Tito's face and scalp, blurry vision, and other injuries;

    c.  Lydick drive-stunned Tito multiple times with a Taser pressed against Tito's back and face, causing pain and injuries to Tito; and

    d.  Boffitto knelt on Tito's back after the punching stopped, as Lydick put Tito in leg shackles.

2.  NHSP Warden Michael Zenk failed to protect Tito, in violation of Tito's Eighth Amendment rights, in that:

a.    Zenk, with deliberate indifference to a
substantial risk of serious harm to Tito, prior to
November 9, 2017, failed to protect Tito from the
officers involved in the November 9 incident; and

b.    Zenk failed to take steps to protect Tito after
November 9, 2017, with deliberate indifference to a
substantial risk that officers will harm Tito again.

3.    Sgt. Lydick, CO Young, CO Boffitto, and CO Caruso
retaliated against Tito for exercising his First Amendment
rights, in that they participated in the November 9, 2017
use of force incident as summarized in Claim 1, in
retaliation for Tito's filing of his October 1, 2017
grievance.

4.    NHSP mental health worker Barry Zani and DOC Director
of Forensic and Medical Services Paula Mattis, with
deliberate indifference to a substantial risk of serious
harm, delayed treating Tito's unmet mental health needs, in
violation of Tito's Eighth Amendment rights, in that, from
May 2017 until August 22, 2017, Tito did not receive mental
health care and remained without the medications that had
been prescribed for him while he was in the custody of the
Coos County Department of Corrections.

5.    CO Bazile used excessive force against Tito, in
violation of Tito's Eighth Amendment rights, in that Bazile
smashed Tito's head against a wall when Tito was
handcuffed.

6.    The unnamed NHSP dental health provider who treated
Tito after September 6, 2017 violated Tito's rights under
the Eighth Amendment by delaying Tito's access to dental
health care to address all of his serious dental health
needs, relating to rotten, painful, abscessed teeth and a
missing filling, with deliberate indifference to a
substantial risk of serious harm to Tito.

7.    COs Salse, Young, and T. Miller violated Tito's
Fourteenth Amendment right to equal protection by
maliciously singling Tito out for different treatment than
his cellmate Alfred Nyoni, when Tito was in SHU on PAR
status, by allowing Nyoni to have out-of-cell time to
shower, use the phone, and recreate, while denying the same
opportunities to Tito.

8.    Lt. Edmark violated Tito's Eighth Amendment rights, in
that, in working in the SHU control room on November 9,

2017, Edmark made remote adjustments to the wall-mounted security camera, and then CO Young waited for Edmark's "signal" indicating that the camera had been refocused, before the officers in the SHU dayroom took Tito to the floor, struck, and tasered him.

9.    Supervisory officers retaliated against Tito for exercising his First Amendment rights by complaining about incidents of excessive force or other conditions of confinement, in that:

     a.    Captain Boynton's report regarding the November 9 use of force incident included false descriptions of the videos, and Maj. Fouts signed off on Capt. Boynton's report;

     b.    Capt. Boynton and Lt. Fontaine did not properly investigate Tito's complaints about CO Bazile's use of excessive force against Tito and told the warden that his complaints were unsubstantiated; and

     c.    Lt. Fontaine made false statements on Tito's IRS complaining about a lack of mental health care, regarding the number of times Tito had met with a mental health provider.

10.   Because Tito had exercised his First Amendment rights by filing IRSs complaining about CO Bazile, other CCU officers, and the conditions in the CCU:

     a.    Sgt. Parent altered the CCU recreation schedule to trigger a confrontation between Tito and other inmates; and

     b.    Tito was assigned to cells with dangerous CCU inmates known for their violence towards their cellmates and other inmates.

11.   COs violated Tito's Fourteenth Amendment right to equal protection by maliciously targeting Tito for different treatment than every other SHU inmate, in that:

     a.    CO Salse issued Tito an ill-fitting gown without Velcro, and a soaked mattress without a cover, when he was on suicide watch in SHU for two days in August 2017; and

      b.    SHU guards, including CO Salse, denied Tito's requests for a change of clothes over sixteen days in September 2017.

12.   COs violated Tito's Eighth Amendment right to humane conditions of confinement, in that:

      a.    CO Salse issued Tito an ill-fitting gown without Velcro, and a soaked mattress without a cover, and other COs denied Tito's request for a new gown and mattress, when he was on suicide watch in SHU for two days and a night in August 2017;

      b.    SHU guards, including CO Salse, denied Tito's requests for clean clothes and bedding over sixteen days in September 2017;

      c.    COs Salse, Young, and T. Miller denied Tito's requests for out-of-cell time to shower, use the phone, and recreate when he was in SHU in PAR status;

      d.    Tito's SHU segregation cell did not adequately protect him from cold weather, in that,

            i.    for sixty-two days from October 2017 through December 24, 2017, the window did not close properly; and

            ii.  from December 24, 2017 until January 9, 2018, Tito's tier had no heat, causing ice to form on the inside of his window, and Tito's requests for extra blankets and clothes were denied, resulting in Tito being unable to sleep;

      e.    Sgt. Parent altered the CCU recreation schedule to trigger a confrontation between Tito and other inmates; and

      f.    Tito was assigned to cells with dangerous inmates known to be violent toward other inmates.

13.   Intending to retaliate against Tito for exercising his First Amendment rights in complaining about prison conditions COs Caruso, Lydick, or Salse, while serving meals to Tito in 2018, made remarks about Tito's food, and/or gave him threatening looks, causing Tito to refuse meals and lose weight.

14.   Coos County Sheriff's Department Deputy "Charlie" violated Tito's Sixth and Fourteenth Amendment rights by preventing Tito's brother from attending a jury voir dire and interfering with the jury pool in Tito's criminal case.

15.   SHU officers violated Tito's First and Fourteenth Amendment rights relating to mail delivery and access the courts, by:

>       a.   delaying delivery plaintiff's incoming legal mail; and opening Tito's mail from the courts, from the New Hampshire Justice Department, and from Tito's attorney outside of Tito's presence;
>
>       b.   holding up Tito's outgoing legal mail, including mail addressed to the ACLU; and
>
>       c.   delaying Tito's access to his legal files in advance of a court proceeding in September 2017.

16.   DOC Hearings Officers Barton and Paulsen violated Tito's Fourteenth Amendment right to due process in prison disciplinary proceedings.

17.   CO Bazile violated Tito's Fourteenth Amendment right to due process by destroying or stealing items of Tito's property during cell searches.

18.   DOC Commissioner Helen Hanks and Christopher Kench and others, in violation of Tito's Eighth Amendment rights, failed to protect Tito from a substantial risk of serious harm after reviewing his grievances.

## **Discussion**[4]

I.   <u>Eleventh Amendment</u>

Tito has named the State of New Hampshire as a defendant.

His claims for damages and injunctive relief against the State,

and his claims for damages against state officers in their

---

[4]The standard applied in the preliminary review of Tito's complaint addenda is set forth in the January 25, 2018 Order (Doc. No. 4).

official capacities are barred by the Eleventh Amendment and
should be dismissed.  See Town of Barnstable v. O'Connor, 786
F.3d 130, 138 (1st Cir. 2015).


II.   Eighth Amendment Excessive Force (Claim 1)

     This court previously directed service of the excessive
force claim (Claim 1) arising out of the November 9 incident
against Sgt. Lydick, CO Young, and four unnamed COs, see January
25 Order (Doc. No. 4).  Claim 1 in the January 25 Order (Doc.
No. 4) has been amended by allegations in Tito's complaint
addenda.  In the Order issued this date, the court directs CO
Boffitto, CO Young, CO Caruso, and Sgt. Lydick to answer or
otherwise plead in response to Claim 1, as summarized in this
Amended R&R, with respect to any new allegations in Document
Nos. 6, 8, 10, 18, 27, 29, 37, 43, 48, 52, 56, 57, and 62.


III.  Eighth Amendment Failure to Protect

     A.   Standard

     [A] prison official violates an inmate's Eighth Amendment
     right against cruel and unusual punishment "based on a
     failure to prevent harm" to the inmate only under two
     circumstances: "the inmate must show that he is
     incarcerated under conditions posing a substantial risk of
     serious harm," and the prison official must have acted, or
     failed to act, with "deliberate indifference to inmate
     health or safety."

Lakin v. Barnhart, 758 F.3d 66, 70 (1st Cir. 2014) (quoting

Farmer v. Brennan, 511 U.S. 825, 834 (1994)).

B.  Warden Zenk (Claim 2)

This court previously allowed Claim 2 to proceed against
Warden Zenk as specified in that Order.  Zenk is directed in the
Order issued this date to answer or otherwise plead in response
to Claims 2(a) and 2(b), as summarized above, with respect to
any new allegations in Document Nos. 6, 8, 10, 18, 27, 29, 37,
43, 48, 52, 56, 57, and 62.


C.  Lt. Edmark (Claim 8)

In Claim 8, Tito names Lt. Edmark as a defendant to a claim
regarding the November 9 incident, which Tito has explained, is
based on what Tito saw when he looked at the unredacted security
camera video of that incident.  Tito alleges that Edmark, in his
post in the SHU control room, in front of the monitors showing
the events recorded by wall-mounted security cameras, adjusted
the focus of the wall-mounted security camera in the SHU
dayroom, intending to obscure what would transpire, and that CO
Young looked for Edmark's "signal" before the officers took Tito
to the floor.

The court has reviewed the videos at issue (Doc. Nos. 26,
92) that Tito incorporates in his pleadings.  The unredacted
security camera video (Doc. Nos. 26, 92) shows an officer in the
SHU dayroom turning his face towards the security camera shortly
before taking Tito down.  There is no apparent readjustment of

the camera's focus or angle, occurring any time before or after the officer looks towards the camera.

Tito's claim essentially alleges a conspiracy between Edmark and the officers who beat Tito.  A civil rights conspiracy is "a combination of two or more persons acting in concert to commit an unlawful act, or to commit a lawful act by unlawful means, the principal element of which is an agreement between the parties to inflict a wrong against or injury upon another, and an overt act that results in damages." Estate of Bennett v. Wainwright, 548 F.3d 155, 178 (1st Cir. 2008). Although "pro se complaints are to be read generously, allegations of conspiracy must nevertheless be supported by material facts, not merely conclusory statements." Slotnick v. Garfinkle, 632 F.2d 163, 165 (1st Cir. 1980) (per curiam) (citation omitted).  In the absence of any apparent alteration of the camera, Tito's allegations regarding CO Young looking for Edmark's signal are purely speculative.  Stripped of such speculation, Tito's allegations that Edmark, aware of Tito's complaints, made some sort adjustment to the camera, and that Young momentarily looked towards the camera before the assault on Tito began, all fail to state a claim that Edmark pursuant to an agreement with Young or any other officer in the dayroom violated Tito's civil rights under the Eighth Amendment on November 9, 2017.  The complaint does not allege any facts that, if taken as true, would establish that there was any agreement

between Edmark and the other officers to violate Tito's rights
at that time.  Furthermore, Tito's allegations fail to state a
claim that Edmark was subjectively aware that his conduct in the
control room would subject Tito to a substantial risk of serious
harm in another room, on the other side of a security camera
lens.  Accordingly, Claim 8 should be dismissed for failure to
state a claim upon which relief can be granted.

      D.   <u>Commissioner's Office & Others (Claim 18)</u>

Tito has alleged that the grievances he submitted to the
DOC Commissioner's Office provided Christopher Kench and
Commissioner Hanks with notice that SHU officers were
threatening and harassing Tito, and that Tito was at risk of
harm.  Tito alleges that neither Kench nor Hanks took adequate
steps to protect him.  Tito points specifically to grievances in
late November 2017 in which he asserted that he had been
subjected to excessive force and harassment and that his
complaints had not been adequately investigated, to which Hanks
and Kench responded that the Commissioner's Office needed more
details regarding the alleged misconduct to be able to
investigate and respond to it.  Tito's allegations, with respect
to such grievances do not demonstrate that Kench and Hanks were
subjectively aware of a substantial risk of serious harm to Tito
prior to the November 9, 2017 incident, or that they failed to

take reasonable steps to reduce any risk of any substantial risk of serious harm after that incident.

Tito has also failed to state claims upon which relief can be granted, with respect to the list of officers, health care providers, his court-appointed public defender,[5] and others who he alleges did not protect him after he reported injuries and his concerns about abuse. The individuals named by Tito are not alleged to have had subjective knowledge that their failure to report or respond favorably to Tito's requests would subject Tito to a substantial risk of serious harm. Accordingly, except as to the claims addressed in the Order issued this date, Tito's failure to protect claims, summarized in Claim 18, should be dismissed.

IV.   Retaliation (Claims 3, 9, 13)

     A.   Standard

To state a First Amendment retaliation claim, an inmate must allege: (1) that the conduct which led to the retaliation was protected by the First Amendment; (2) that she or he suffered adverse action at the hands of the prison officials; and (3) that there was a causal link between the exercise of her

---

[5]Additionally, Tito's allegations against his court-appointed public defender fail to state a claim under 42 U.S.C. § 1983 because his attorney, as a private actor, is not amenable to suit for a violation of Tito's constitutional rights. See Polk Cty. v. Dodson, 454 U.S. 312, 321-22 (1981); Georgia v. McCollum, 505 U.S. 42, 54 (1992).

or his First Amendment rights and the adverse action taken.  See
Hannon v. Beard, 645 F.3d 45, 48 (1st Cir. 2011).  De minimis
reactions to protected speech are not actionable.  See Morris v.
Powell, 449 F.3d 682, 685-86 (5th Cir. 2006).  An adverse act
taken in response to protected conduct is not de minimis,
however, if it would deter an individual of ordinary firmness
from exercising his or her First Amendment rights.  See id.; see
also Starr v. Dube, 334 F. App'x 341, 342-43 (1st Cir. 2009).


    B.   Retaliatory Use of Excessive Force (Claim 3)

Claim 3 above summarizes Tito's First Amendment retaliation
claim that officers involved in the November 9 incident used
excessive force upon him because he had complained about prison
conditions.  Claim 3 survives this preliminary review.
Accordingly, in the Order issued this date, the court has
directed service of Claim 3 against Sgt. Lydick and COs Young,
Caruso, and Boffitto.


    C.   Retaliatory False Reports or Investigation (Claim 9)

Tito alleges in Claim 9 that supervisory officers made
false statements or undertook inadequate investigations and then
reported to their supervisors that Tito's claims of
constitutional violations were unsubstantiated.  Tito alleges
that Lt. Fontaine falsely reported how many times he had met
with a mental health care provider while in CCU, that Capt.

Boynton prepared an after-action report of the November 9 incident including false statements, which Maj. Fouts signed off on, and that Capt. Boynton and Lt. Fontaine improperly investigated Tito's allegations regarding CO Bazile, or falsely reported that Tito's complaints were not substantiated.

Without more, an inmate does not state a viable Fourteenth Amendment claim based on an allegation that officers made false statements in reporting on an incident involving the inmate. Cf. Covarrubias v. Wallace, 907 F. Supp. 2d 808, 818 (E.D. Tex. 2012) ("No case has held that the making of a false statement during a prison disciplinary proceeding itself violates any right protected by the Constitution or laws of the United States."). Thus, to the extent Tito asserts that he had a due process right to accuracy in the reports at issue, Claim 9 should be dismissed for failure to state a claim upon which relief can be granted.

To the extent Claim 9 is intended to assert claims of First Amendment retaliation, Claim 9 does not allege more than de minimis adverse consequences for the exercise of First Amendment rights. Inmates of ordinary firmness would not be deterred from taking steps to grieve claims of inadequate mental health care access, or claims of excessive force or harassment, for fear that officers handling those complaints would misrepresent the frequency of times they met with health care providers, misstate what happened in videos that recorded the alleged incidents of

excessive force, or fail to find after an investigation that the inmate's claims were substantiated. All of those acts were in the nature of an administrative denial of a grievance, and none caused this plaintiff to refrain from exercising his First Amendment rights. Cf. Dicey v. Hanks, No. 2:14-cv-2018 JAM AC P, 2015 U.S. Dist. LEXIS 107487, at *11, 2015 WL 4879627, at *5 (E.D. Cal. Aug. 14, 2015) ("denial of a grievance neither constitutes an adverse action that is more than de minimis nor is it sufficient to deter a prisoner of 'ordinary firmness' from further First Amendment activities"), R&R adopted, No. 21:4-CV-2018 JAM AC P, 2015 WL 6163444, 2015 U.S. Dist. LEXIS 140655 (E.D. Cal. Oct. 15, 2015). Accordingly, Claim 9 should be dismissed for failure to state a claim upon which relief could be granted.


      D.    Retaliatory Looks and Comments (Claim 13)

Claim 13 summarizes Tito's First Amendment retaliation claim that COs Caruso, Lydick, and Salse retaliated against him for complaining about their conduct by making remarks about food and giving Tito threatening looks. The prospect of being subjected to threatening looks and comments about food would not deter an inmate of ordinary firmness from exercising his First Amendment rights. Accordingly, Claim 13 should be dismissed for failure to state a claim upon which relief can be granted.

V.    Equal Protection Claims (Claims 7, 11)

The Equal Protection Clause of the Fourteenth Amendment requires that similarly situated persons are to receive substantially similar treatment from the government. Tapalian v. Tusino, 377 F.3d 1, 5 (1st Cir. 2004). An equal protection claim may be based on a "class of one." Donovan v. City of Haverhill, 311 F.3d 74, 77 (1st Cir. 2002). When pleading an equal protection claim based on a class of one, a plaintiff must allege that he or she has "'been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment.'" See id. (citation omitted).

A "class of one" equal protection claim requires proof of "'an extremely high degree of similarity between [plaintiffs] and the persons to whom they compare themselves.'" Snyder v. Gaudet, 756 F.3d 30, 34 (1st Cir. 2014) (citations omitted). Tito must show that he and the other inmates who were treated differently "'engaged in the same activity . . . without such distinguishing or mitigating circumstances as would render the comparison inutile.'" Id. (citation omitted). In addition, a "class of one" plaintiff must generally plead facts to "show that the defendant's differential treatment of the plaintiff was motivated by 'bad faith or malicious intent to injure.'" Id. (citation omitted).

25

Tito's allegations summarized in Claims 7 and 11 about being treated differently than his cellmate while in SHU on PAR status, by COs T. Miller, Young, and/or Salse, are minimally sufficient to survive preliminary review.  Accordingly, in the Order issued this date the court has directed service of Claims 7 and 11.


VI.   Conditions of Confinement & Endangerment (Claim 12)

Claim 12 summarizes Tito's allegations regarding the conditions in which he was confined in SHU and CCU for periods of time between May 2017 and January 2018.  The Eighth Amendment "prohibits prison officials from depriving inmates of 'the minimal civilized measure of life's necessities.'"  Brown v. Plata, 131 S. Ct. 1910, 1959 (2011) (citation omitted).  A plaintiff asserting an Eighth Amendment prison conditions claim must allege objectively "extreme" deprivations.  Hudson v. McMillian, 503 U.S. 1, 9 (1992).  Further, the plaintiff must show that the responsible defendants acted with deliberate indifference to the plaintiff's health or safety.  See Farmer, 511 U.S. at 834.  "'[A] prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety.'"  Giroux v. Somerset Cty., 178 F.3d 28, 32 (1st Cir. 1999) (citations omitted).

Tito's allegations about: receiving a gown lacking Velcro that did not close, a wet mattress made of foam without a cover, a single unappetizing meal in a paper bag tossed through a tray slot, the denial of a change of clothes over the course of sixteen days in September 2017, being in a cell with a window that did not close securely from October 2017 through December 23, 2017, and then being in a different cell on a tier with so little heat Tito could not sleep from December 24, 2017 through January 9, 2018, do not, without more, demonstrate that the officers involved in those incidents knowingly or purposefully subjected Tito to any substantial risk of serious harm. Accordingly, Claim 12(a)-(d) should be dismissed for failure to state a claim upon which relief can be granted.

Furthermore, Tito's allegations regarding the alterations to the CCU recreation schedule and his CCU cell assignments do not plead facts showing deliberate indifference.  Although Tito alleges that Sgt. Parent knew that the alterations to the CCU recreation schedule would cause conflicts to arise between Tito and other inmates, Tito has not pleaded facts suggesting that the conflicts subjected Tito to any substantial risk of serious harm, or that Sgt. Parent was subjectively aware that such a substantial risk would arise.  Similarly, Tito's allegations regarding the three inmates at issue with whom he was celled do not suggest that those inmates had ever threatened to harm Tito, or that any officer responsible for assigning Tito to a cell

27

with any of those inmates was aware that doing so would present
a substantial risk of serious harm to Tito or ignored a fact
which would so indicate.  Accordingly, Claims 12(e)-12(f) should
be dismissed for failure to state an Eighth Amendment
endangerment claim upon which relief can be granted.


VII. <u>Coos County Deputy Sheriff (Claim 14)</u>

Tito's claims regarding the conduct of the Sheriff's Deputy
named Charlie fail to state claims upon which relief can be
granted in this action.  Charlie's comments, alleged involvement
in the Silver Eagles, and intimidation of Tito's family and
friends do not give rise to any actionable claim that Tito can
assert in this case.  Moreover, Charlie's alleged tampering with
Tito's jury pool and failure to provide public access to the
jury selection process are claims that Tito may not litigate
without pleading facts showing that the criminal conviction
relating to those matters has been invalidated.  <u>See generally</u>
<u>Heck v. Humphrey, 512 U.S. 477, 487 (1994)</u> (courts must dismiss
§ 1983 claims if judgment in plaintiff's favor would necessarily
imply invalidity of conviction or sentence that has not been
invalidated).  Accordingly, Claim 14 asserted against "Charlie"
should be dismissed, and he should be dropped as a defendant.

VIII. Legal Mail and Legal Property (Claim 15)

Tito has alleged matters concerning the handling of his incoming and outgoing mail in filings this court construes to be complaint addenda.  Tito has alleged that prison officials opened Tito's legal mail outside of Tito's presence and delayed delivery of some of his incoming and outgoing legal mail.

An "isolated incident of mail tampering is usually insufficient to establish a constitutional violation." Davis v. Goord, 320 F.3d 346, 351 (2d Cir. 2003).  Allegations that prison officials have not complied with prison policies in handling an inmate's mail are not enough, without more, to state a claim of a violation of the inmate's federal rights.  See Farrar v. Peters, 698 F. App'x 395, 395 (9th Cir. 2017) (prison official's failure to follow prison regulations does not constitute a constitutional violation).

Tito has not alleged that officers tampered with the contents of his mail, or that he suffered any injury injured due to the delays in delivery or opening of his mail outside of his presence.  Accordingly, Tito has failed to state any claim with regard to the treatment of his mail.

Tito further alleges that guards did not release his legal paperwork upon his request when he had proceedings in September 2017.  As Tito has failed to allege that the delays in Tito's access to legal materials actually injured Tito in his ability to litigate a criminal case, or to pursue any nonfrivolous claim

in a post-conviction proceeding or other civil rights matter that he had a right to litigate, Tito has failed to state a claim of a denial of access to the courts upon which relief can be granted.  See Lewis v. Casey, 518 U.S. 343, 352, 354-55 (1996).  Accordingly, Claim 15 should be dismissed.


IX.   Prison Disciplinary Proceedings (Claim 16)

     Tito's allegations regarding biased hearings officers and other problems with the disciplinary process (Claim 16), appear intended to assert that Tito has not received due process at the NHSP.  Due process requirements apply only to the deprivation of protected interests in life, liberty, or property.  See Mathews v. Eldridge, 424 U.S. 319, 332 (1976); González-Fuentes v. Molina, 607 F.3d 864, 880 n.13 (1st Cir. 2010).  Protected liberty interests, for a prisoner challenging the imposition of sanctions through disciplinary proceedings, "will be generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." Sandin v. Conner, 515 U.S. 472, 484 (1995) (citations omitted).

     Tito's allegations regarding being placed in the tank multiple times, including, on one occasion, for sixty-two days, without more, do not give rise to a viable due process claim.

30

See, e.g., id. (30 days in punitive segregation did not
implicate liberty interest); Towle v. Eldridge, No. 11-cv-293-
SM, 2011 WL 6965471, at *2-*3, 2011 U.S. Dist. LEXIS 150862, at
*6, *9-*10 (D.N.H. Dec. 20, 2011) (forty-nine days in pending
administrative review status in segregation and twenty days in
punitive segregation (10 days imposed, 10 days suspended), were
not atypical and significant hardships), R&R approved by No. 11-
cv-293-SM, 2012 WL 40458, 2012 U.S. Dist. LEXIS 2611 (D.N.H.
Jan. 6, 2012); Fiorentino v. Biershbach, 64 F. App'x 550, 551-52
(7th Cir. 2003) (sixty days segregated confinement); Zamakshari
v. Dvoskin, 899 F. Supp. 1097, 1108 (S.D.N.Y. Aug. 16, 1995)
(sixty days), R&R approved by 899 F. Supp. 1097, 1100 (S.D.N.Y.
Sept. 8, 1995).  Accordingly, Claim 16, relating to the
disciplinary proceedings, should be dismissed.


X.    Destruction and Theft of Property (Claim 17)

     Claim 17 summarizes Tito's claims that CO Bazile destroyed
or stole his property in cell searches.  "[A]n unauthorized
intentional deprivation of property by a state employee does not
constitute a violation of the procedural requirements of the Due
Process Clause of the Fourteenth Amendment if a meaningful
postdeprivation remedy for the loss is available." Hudson v.
Palmer, 468 U.S. 517, 533 (1984).  The State of New Hampshire
provides an adequate postdeprivation remedy pursuant to N.H.
Rev. Stat. Ann. §§ 541-B:9 and 541-B:14 (providing a post-

31

deprivation means of recouping property loss attributable to the State).  Tito has failed to demonstrate that the remedy provided by the state is unavailable or inadequate.  Claim 17 should be dismissed in this case.


XI.   Claims 4, 5, 6, and 10

     The claims identified by the court and summarized in this Amended R&R as Claims 4, 5, 6, and 10 are severed from this case by the Order issued this date.  This court declines to complete its preliminary review of those claims here, anticipating it may do so separately in the new cases that will be opened pursuant to that Order.


XII.  John Does 1-4

     The January 25 Order (Doc. No. 4) used the identifier, "John Does 1-4," to refer to the unnamed corrections officers who plaintiff alleges were involved in the November 9, 2017 assault.  In the Order issued this date, this court has directed service of the excessive force claims relating to that incident upon defendants Lydick, Young, Boffitto, and Caruso.  The district judge should direct that the clerk's office drop "John Does 1-4," and update the docket to indicate that Lydick, Young, Boffitto, and Caruso are defendants to this action.

32

XIII.  Remaining Defendants and Claims

Except as otherwise noted in this Amended R&R or in the Order issued this date, none of Tito's remaining allegations in the pleadings before this court states any claim upon which relief can be granted.  All defendants named by Tito in his pleadings other than defendants Boffitto, Caruso, Lydick, T. Miller, Salse, Young, and Zenk should be dropped as parties.

**Conclusion**

For the foregoing reasons, the magistrate judge recommends that the district judge approve this Amended R&R, thereby directing, as follows:

> 1.  The facts asserted in Tito's complaint and complaint addenda (Doc. Nos. 1, 2, 6, 8, 10, 18, 27, 29, 37, 43, 48, 52, 56, 57, 62) are considered, in the aggregate, as the complaint in this matter for all purposes.
>
> 2.  Claims 8, 9, 12, 13, 14, 15, 16, 17, and 18 as identified in the Amended R&R are dismissed from this case, for failure to state a claim upon which relief can be granted, pursuant to 28 U.S.C. §§ 1915A & 1915(e)(2).
>
> 3.  All defendants named by Tito in Document Nos. 1, 2, 6, 8, 10, 18, 27, 29, 37, 43, 48, 52, 56, 57, and 62, except for defendants Boffitto, Caruso, Lydick, T. Miller, Salse, Young, and Zenk, are dropped from this action.
>
> 4.  The clerk's office is directed to terminate "John Does 1-4."

Any objections to this Amended R&R must be filed within fourteen days of receipt of this notice.  See Fed. R. Civ. P. 72(b)(2).  The fourteen-day period may be extended upon motion.

Failure to file objections within the specified time waives the right to appeal the district court's order.  See [Santos-Santos v. Torres-Centeno, 842 F.3d 163, 168 (1st Cir. 2016)](#).

_____
Andrea K. Johnstone
United States Magistrate Judge

October 15, 2018

cc:  Albert Tito, pro se
     Anthony Galdieri, Esq.
     Lawrence Edelman, Esq.